IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KAREN PITTER     :

          :

 v.       :  Civil Action No. DKC 07-2968

          :

COMMUNITY IMAGING PARTNERS,
INC.        :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this sexual harassment case is a motion filed by Defendant Community Imaging Partners, Inc., for summary judgment. (Paper 47). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion will be denied.

## I. Background

The following facts are either uncontroverted or construed in a light most favorable to Plaintiff, the non-moving party. Defendant Community Imaging Partners, Inc. ("Community Imaging"), provides outpatient diagnostic imaging services, such as x-rays, CT scans, and MRIs, at various locations. On September 27, 2004, Community Imaging hired Plaintiff Karen Pitter as a Radiology Technologist at its facility in Greenbelt, Maryland. Plaintiff retained that position until her employment was terminated on June 13, 2005.

Shortly after she was hired, Plaintiff attended a new hire orientation meeting where she was advised of Community Imaging's policies and procedures regarding workplace conduct, conflict resolution, and performance expectations. She was told about the company's progressive discipline policy, pursuant to which problems were addressed initially by informal counseling, then by written warnings, and followed, if necessary, by termination. She was also advised of her new employer's policy regarding harassment in the workplace:

> If you feel you're being discriminated against or harassed on the job, you have a responsibility to report it. In most situations, you should talk with your manager immediately. If you're not comfortable talking to your manager or if s/he is the harasser, or if resolution is not achieved after talking to him/her, then talk with his/her manager or your Human Resources representative. If you're not sure how to reach your Human Resources representative or if s/he is not available, call the Human Resources department in our National Support Center at [phone number] and state that you need immediate assistance with an employee relations issue.

(Paper 47, Ex. E, Harassment-Free Workplace statement). The anti-harassment policy also required any manager receiving a complaint to "work with [a] Human Resources representative to address it." (*Id.*).

As a Radiology Technologist, Plaintiff was responsible for performing x-ray imaging examinations and otherwise providing

care for patients who came to the Greenbelt facility for that purpose. She was supervised by Joseph Martinez, the Radiology Manager; Jonelle Henry, the Team Lead Technologist; and, when Mr. Martinez and Ms. Henry were away from the office, by Sonja Josie, the Patient Service Representative Team Lead. Mr. Martinez, the most senior manager at the Greenbelt facility, was supervised by Karen Trevathan, the Regional Manager of Clinical Operations, who rotated through various Community Imaging facilities in the region and met with Mr. Martinez in Greenbelt approximately once per month.

In or around October or November 2004, Kim Thomas, a co-worker of Plaintiff's, observed what she believed to be overtly flirtatious behavior in the workplace between Plaintiff and Mr. Martinez. Although Plaintiff worked on a different floor of the Greenbelt facility, she was frequently seen visiting with Mr. Martinez on the floor where he worked. On one occasion, Ms. Thomas saw Plaintiff approach Mr. Martinez and "push her butt toward [his] penis area in a playful and flirtatious way when he was speaking to other employees." (Paper 47, Ex. M, Thomas Aff., at ¶ 2).[1] On another, she saw "Mr. Martinez stroke

---

[1] Plaintiff contends that Ms. Thomas' affidavit should be "dismissed" because "it was taken on November 18, 2009[,] after discovery closed on [] October 1, 2009." (Paper 57, at 4). She makes the same argument with respect to the supplemental affidavit of Ms. Trevathan. (*Id*. at 5). Plaintiff points to no legal authority in support of these claims, however, nor is the

[Plaintiff's] hair and touch her fingers flirtatiously." (*Id*.).
Based on these observations, Ms. Thomas believed that Plaintiff
and Mr. Martinez were "involved in a mutual relationship outside
of work." (*Id*. at ¶ 3). She reported this "unprofessional
behavior" to the Human Resources department. (*Id*. at ¶ 5).

Several other employees made similar complaints at around
the same time. In response, from January 31 to February 3,
2005, Human Resources personnel conducted an internal
investigation of reports that Plaintiff was "receiving
'preferential' treatment from her supervisor, Mr. Martinez, and
amid rumors that the two were engaged in a romantic
relationship." (Paper 47, Ex. A, Trevathan Aff., at ¶ 2; Paper
47, Ex. C, Plaintiff Dep., at 109-10; Paper 47, Ex. B, Martinez
Dep., at 117-18, 134-35). The employees interviewed during this
investigation reported a number of incidents suggestive of a
romantic relationship between Plaintiff and her supervisor.

court aware of any requirement that affidavits in support of a
motion for summary judgment must be executed prior to the close
of discovery. Plaintiff does not allege unfair surprise
regarding these witnesses; indeed, Ms. Trevathan previously
submitted an affidavit in this case and documents containing the
substance of Ms. Thomas' statements were provided to Plaintiff
in discovery and were referred to by Plaintiff in support of her
claims at her deposition. (Paper 47, Ex. C, at 98). While it
is true, as Plaintiff observes, that Ms. Trevathan's
supplemental affidavit is not notarized, it was executed "under
penalty of perjury," and thus qualifies as an unsworn
declaration under 28 U.S.C. § 1746. Accordingly, insofar as
Plaintiff moves to strike these affidavits, that motion is
denied.

They additionally expressed concern that although Plaintiff had no supervisory authority, she frequently spoke to them in a demeaning manner, was critical of the quality of their work, and reported their mistakes to Mr. Martinez. (Paper 147, Ex. N, Investigation Documentation; Paper 157, Ex. A). Ms. Henry spoke directly with Plaintiff about the rumors of her relationship with Mr. Martinez and asked whether they were true; Plaintiff denied that they were. (Paper 47, Ex. C., at 110, 113, 159; Paper 57, Attach. 27, Plaintiff Aff., at ¶ 3). Mr. Martinez also denied that any romantic relationship existed between him and Plaintiff (Paper 47, Ex. B, at 113), and the investigation concluded with the finding that "nothing inappropriate [had] happened" (*id.* at 118).

According to Plaintiff, it was around this time that Mr. Martinez began making suggestive comments and unwanted advances toward her. The first such incident occurred when, upon her return from a trip to Jamaica during "the second or third week in January [2005]," Mr. Martinez "asked [her] something about who [she] saw down there." (Paper 47, Ex. C, at 87-88). During another conversation, Mr. Martinez related to Plaintiff that Ms. Thomas had reported to Human Resources that she saw Mr. Martinez "touching" her, and that he "thought it was funny that they referred her back to him, that she had to go and talk to him

about it." (*Id.* at 89). These and similar remarks made by Mr. Martinez made Plaintiff feel "uncomfortable." (*Id.*).

On another occasion in January, Plaintiff was in the process of taking an x-ray of a patient when Mr. Martinez "came up behind [her]" and "tried putting his hands" on her "waist and buttocks area." (*Id.* at 90-91). Plaintiff told him, "if you want to be friends, that's okay, but as far as the touching goes, no." (*Id.* at 89-90). Despite her stated opposition, similar conduct occurred "randomly on different occasions" in the ensuing months, with Mr. Martinez frequently attempting to "play it off" as accidental touching, but at other times openly "groping" Plaintiff's body. (*Id.* at 91, 97). From January to June 2005, Mr. Martinez repeatedly touched Plaintiff's breasts, buttocks, arms, legs, hair, and attempted to kiss her in the workplace. (*Id.* at 66, 68, 89-104; Paper 57, Attach. 27, at ¶ 2).[2]

_____

[2] In the deposition excerpts provided by Defendant, Plaintiff was unable to recall specific detail of many of these events, claiming that she "just kind of block[s] it [out]." (Paper 47, Ex. C, at 66). She estimated that Mr. Martinez touched her buttocks on at least twenty-five occasions and her breasts on more than five occasions. (*Id.* at 94-95). Plaintiff acknowledged that it was "possible" that she saw Mr. Martinez socially, outside of work-related functions, on one occasion in the fall of 2004, but she did not specifically recall the event. (*Id.* at 54, 79, 82). She repeatedly denied ever having a consensual sexual or romantic relationship with him, however. (*Id.* at 83-84).

After work, Plaintiff frequently visited with her neighbor, Cathy Mack, before returning home. Beginning in February 2005, she began to complain to Ms. Mack about "the sexual advance[s] and statements of Mr. Martinez." (Paper 24, Attach. 4, Mack Aff., at ¶ 2).[3] On one occasion in March 2005, Ms. Mack saw Mr. Martinez parked in a vehicle outside of Plaintiff's home and observed Plaintiff approach him and demand that he "leave and leave her alone," insisting that she had no interest in a romantic relationship with him. (*Id.* at ¶ 5; Paper 47, Ex. C, at 208). On another occasion, Ms. Mack received a phone call from Plaintiff at approximately 1:30 a.m. requesting that she "check [to see] if Mr. Martinez was in front of her house because he had been calling her phone[] and leaving suggestive messages on it all day." (Paper 24, Attach. 4, at ¶ 5). At around this time, Plaintiff began experiencing acute symptoms of stress, including depression, related to Mr. Martinez's conduct. (*Id.* at ¶ 8; Paper 47, Ex. C, at 128).

---

[3] Plaintiff submitted Ms. Mack's affidavit in support of her opposition to Defendant's prior motion to dismiss, but failed to resubmit it in support of her opposition to the motion for summary judgment. In light of the fact that Plaintiff is proceeding *pro se*, and because the affidavit is consistent with Plaintiff's deposition testimony, the court will consider it here. For the same reasons, the court will also consider the affidavit submitted by Deborah Agbebaku, Plaintiff's co-worker and friend, in support of her opposition to Defendant's motion to dismiss. (Paper 24, Attach. 5).

On or about March 22, 2005, Plaintiff received an annual performance review from Mr. Martinez. Although she received an overall performance rating of "meets expectations," the evaluation was critical in several respects. (Paper 47, Ex. R, Performance Review). For example, Mr. Martinez noted that Plaintiff had a "very directive approach [that] has been perceived by some to be hostile." (*Id.*). He recommended that she "take a course on dealing with difficult people," that she be "more tactful in her approach with her peers," and that she attempt "to understand and respond to the directives given by [Ms. Henry and/or Ms. Josie] when they are left in charge of operations." (*Id.*). The review further identified a number of performance goals for the coming year, including cross-training Plaintiff in conducting CT scans.

On or about March 24, 2005, Brandi Nichols, a Human Resources representative, met with Plaintiff for the purpose of conducting her "New Employee Interview." Ms. Nichols posed a number of questions regarding Plaintiff's early experiences at Community Imaging and recorded the answers she provided. The document reflects that Plaintiff rated her "interview experience with the hiring manager," *i.e.*, Mr. Martinez, as "excellent," the "relationship with [her] manager" as "good," and added that "[m]anagement was very supportive[] when everyone was spreading rumors." (Paper 47, Ex. P, New Employee Interview). Plaintiff

further related that Mr. Martinez and Ms. Henry were "making it a point not to show favor[i]tism and it is working against me"; that her co-workers "do not like how I say something [w]hen I call them on their jobs"; and complained that "there is backlash" for questioning "Team Leaders." (*Id*.). Plaintiff asserts that she also reported Mr. Martinez's "harassment" to Ms. Nichols during this interview, but the Human Resources representative failed to record her response and took no action. (Paper 147, Ex. C, at 130).[4]

On or about April 13, 2005, Plaintiff received a bouquet of flowers at work from an anonymous source. The card accompanying the flowers stated, "Karen[,] Just wanted to put a [s]mile on your face. From: Mr. 50 messages." (Paper 57, Ex. W, photocopy of card). Plaintiff threw away the flowers when she learned they were not sent by her boyfriend, but retained the card that accompanied them. She later received a phone call from Mr. Martinez acknowledging that he had sent them. (Paper 47, Ex. C, at 167-68, 171-74).[5]

---

[4] In her motion papers, Plaintiff alleges that Ms. Nichols dismissed her allegations of harassment, telling her "it is all a matter of perception." (Paper 57, at 2). She has pointed to no evidence in support of this claim, however. Similarly, Defendant argues that Plaintiff did not complain to Ms. Nichols, but has provided no evidence to rebut Plaintiff's testimony that she did.

[5] Ms. Henry avers that she was present when Plaintiff received the flowers, that Plaintiff told her they were

At around the same time, Plaintiff's direct supervisor, Ms. Henry, and another employee, Jonelle Mitchell, complained to Ms. Trevathan regarding Plaintiff's "increasingly hostile behavior towards them." (Paper 47, Ex. A, Trevathan Supp. Aff., at ¶ 8). At a subsequent meeting, Ms. Henry and Ms. Mitchell explained to Ms. Trevathan that Plaintiff "was nasty with patients and had [a] poor attitude at work." (*Id.*). On or about April 26, 2005, Mr. Martinez and Ms. Henry met with Plaintiff for the purpose of counseling her regarding these complaints. This meeting was memorialized by a "Performance Counseling" memorandum, which stated that "[s]everal of the employees have shared concerns . . . about how you try to dictate to them how things should be done and get a very nasty attitude when they don't agree with you." (Paper 47, Ex. S). During the meeting, Plaintiff asked Mr. Martinez why "every time I refute him and I turn down his offers or his candies that he gave me, this is when this performance counseling came about." (Paper 47, Ex. C, at 160). Nevertheless, she agreed to "do [her] part to work with [her] peers," to "avoid any behavior that may antagonize them," and to address concerns she had with Ms. Henry or Ms. Josie prior to consulting Mr. Martinez. (Paper 47, Ex. S). The memorandum concluded by stating that "any further performance issues of

"probably" from Mr. Martinez, and that she appeared to be happy to receive them. (Paper 47, Ex. O, at ¶ 7).

this type may lead to further disciplinary action up to and including termination." (*Id*.).

On May 11, 2005, Plaintiff hand-delivered a memorandum to Ms. Henry stating as follows:

> I am asking you please to talk to Joseph Martinez and ask him to stop harassing me. I have told him several times that I am not interested in him. When he calls me into his office and I try to leave the door open[,] he closes it. He then tries to kiss me and force himself on me. He does this more in the evenings after you and the others leave. Could you also act as an intermediary between us so I won't have any contact with him? He has created a very hostile environment for me. I am asking you as a supervisor and woman please help to put a stop to it. I have the card from the flowers and chocolate that he sent me.

(Paper 57, Ex. J). In response, Ms. Henry told Plaintiff that "Mr. Martinez was the boss and [she] had to play the game to get ahead." (Paper 47, Ex. AA, EEO charge).[6]

On or about June 2, 2005, Mr. Martinez received a phone call from Ms. Trevathan while he was away from the office

---

[6] In her affidavit, Ms. Henry denies having ever seen this memorandum. (Paper 47, Ex. O, at ¶ 5). Although Plaintiff has provided no evidence to rebut Ms. Henry's assertion, Defendant has attached her EEO charge, which she signed under penalty of perjury, asserting that "[o]n May 11, 2005, [Plaintiff] complained in writing to Management about the sexual harassment." (*Id*. at Ex. AA). In light of the fact that Defendant now concedes that Ms. Henry's affidavit is inaccurate with regard to when she learned of Plaintiff's allegations (Paper 47, ¶ 75), the EEO charge is sufficient to create a genuine issue of material fact regarding whether Plaintiff provided the memorandum to Ms. Henry on the date in question.

regarding "an issue" with Plaintiff that required his immediate attention. (Paper 47, Ex. A, at ¶ 9; Ex. V, Written Warning). Upon calling Ms. Josie, the manager on duty, Mr. Martinez learned that "no one knew where [Plaintiff was] for about two hours from the time [she] clocked in at 8:38 a.m. that morning," although it was subsequently learned that she left a message with Deborah Agbebaku, a co-worker and friend, indicating that she had "to take care of some personal business and may not be back." (*Id.* at Ex. V; Ex. X, Mitchell statement). Plaintiff called a second time and spoke to Catherine Cornish, another employee, who advised her that Ms. Josie and others were looking for her. Plaintiff refused to speak with Ms. Josie, however, and asked instead to speak again with Ms. Agbebaku. (*Id.* at Ex. V; Ex. W, statement of Catherine Cornish). Plaintiff returned to work at approximately 11:00 a.m., but, shortly thereafter, engaged in an argument with Ms. Josie regarding when she could take a lunch break. During this argument, Plaintiff "walked away from [Ms. Josie]" and "went up to the fifth floor for about thirty minutes" where she was observed making a phone call. (*Id.* at Ex. V). Throughout the remainder of her shift, Plaintiff continued to ignore directives from Ms. Josie, the manager on duty. (Paper 47, Ex. B, at 65-66). On June 10, Plaintiff met with Mr. Martinez and Ms. Henry regarding this incident and was issued a "Written Warning" memorandum detailing

12

the events of June 2.  This memorandum concluded by stating, "If this type of behavior ever reoccurs your employment will be terminated."  (*Id.* at Ex. V).

The next workday after Plaintiff was issued the written warning was June 13, the date of her termination.  Shortly before lunchtime on that date, Mr. Martinez called Plaintiff into his office and "tried to persuade [her] to have a romantic relationship with him and said he would let [her] start training for CT if [she] did and all the things that were happening to [her] would stop."  (Paper 57, Attach 27, at ¶ 7).  Plaintiff refused and told her supervisor that she "had proof" of his harassment, produced the card that accompanied the flowers he sent, and threatened to show it to other managers "if he did not stop trying to touch [her] inappropriately and harassing [her]."  (*Id.;* Paper 47, Ex. C, at 147).[7]

---

[7] According to Mr. Martinez, it was Plaintiff who walked into his office, demanded to begin CT cross-training immediately, and became increasingly disrespectful when he expressed reservations.  Plaintiff then produced the card that accompanied the flowers he had sent her, stating that Mr. Martinez "had better do what she asked because she had stuff on [him]."  (Paper 47, Ex. B, at 83).  Mr. Martinez considered this to be a "threat" because "she knew that she could get [him] in trouble" and she had "leverage over [him] at that point."  (*Id.* at 84).  After about fifteen minutes, Mr. Martinez saw Jonelle Mitchell in the hallway outside his office and called her inside to act as "a witness," at which point Plaintiff left the office.  (*Id.* at 81).

Upon leaving Mr. Martinez's office, Plaintiff called Community Imaging's compliance hotline and attempted to speak with Carrie Adams, the Director of Human Resources, to make a complaint of sexual harassment against Mr. Martinez. (Paper 47, Ex. C, at 213-15). Ms. Adams was not available, but Plaintiff spoke to a representative from her office.

Later that afternoon, Plaintiff was called into a meeting with Ms. Trevathan and Mr. Martinez. Ms. Trevathan told her that "Mr. Martinez had called her that morning stating that he wanted to terminate [her] employment and she was there to support him." (Paper 57, Attach. 27, at ¶ 8). Plaintiff told Ms. Trevathan that Mr. Martinez "had been harassing [her] for months[,] even up to that morning," and that she "had proof," attempting to show her the card. (*Id.*). Ms. Trevathan refused to accept it, however, stating that she "was not interested in seeing it or hearing anything [Plaintiff] had to say." (*Id.*; Paper 47, Ex. C, at 147).[8]

---

[8] According to Defendant, after Plaintiff left his office that morning, Mr. Martinez called Ms. Trevathan and both of them spoke to a Human Resources representative. Upon reviewing Plaintiff's disciplinary history, the Human Resources department made the decision to terminate Plaintiff's employment. Ms. Trevathan and Mr. Martinez then met with Plaintiff and informed her of this decision, at which point Plaintiff told Ms. Trevathan that "she was experiencing a 'nonconsensual sexual relationship' with Mr. Martinez." (Paper 47, Ex. A, at ¶ 12). In response, Ms. Trevathan advised her that "the purpose of the meeting was to discuss her performance and her termination" and that "if she had any other issues she wanted to discuss, she

Shortly thereafter, Community Imaging's Human Resources department conducted an investigation related to events surrounding Plaintiff's termination. (Paper 57, Ex. K, investigative notes). Numerous employees interviewed as part of the investigation reported receiving phone calls from Plaintiff, after she was terminated, which caused them to be "upset and fearful." (*Id*. at 2).[9] The investigation also revealed, however, that on June 8, Plaintiff "stated to [Ms. Henry] that [Mr.] Martinez was harassing and stalking her," that Ms. Henry "believed her complaint was in direct response to discipline that [Mr. Martinez] had issued to [Plaintiff]," and that she reported this only to Mr. Martinez. (*Id*. at 1).[10] The Human Resources representative advised Ms. Henry that "when someone alleges harassment of any kind that she needs to notify Human Resources immediately." (*Id*.).

---

should report them to Human Resources." (*Id*.). On June 15, Mr. Martinez prepared a memorandum detailing these events. (Paper 47, Ex. Y).

[9] The report generally reflects that Plaintiff contacted these employees to request their cooperation in connection with Ms. Adams' investigation of her sexual harassment claims.

[10] Although Ms. Henry stated in her sworn affidavit that Plaintiff "never complained to me, whether orally or in writing, about sexual harassment, discrimination or retaliation," and that if she had done so she "would have reported such complaints as was my duty as a supervisor" (Paper 47, Ex. O, at ¶¶ 4, 5), Defendant must now concede that statement is inaccurate (Paper 47, Attach. 1, memorandum, at ¶ 75).

At the end of June 2005, Plaintiff met with Ms. Adams and counsel for Defendant at a hotel in Greenbelt related to her claims of sexual harassment against Mr. Martinez. (Paper 47, Ex. C, at 53). During this interview, Plaintiff produced a copy of the card that accompanied the flowers, along with faxed confirmation from the retailer indicating that the flowers were ordered by Mr. Martinez. During this investigation, Mr. Martinez initially denied all of Plaintiff's allegations, but later claimed that he and Plaintiff were involved in a consensual sexual relationship that began at some point in October or November 2004 and continued through early February 2005, at around the time of the internal investigation. (Paper 47, Ex. B, at 102-03, 122). In July 2005, Community Imaging terminated Mr. Martinez's employment related to the findings of this investigation. (*Id*. at 17-18).

On April 10, 2006, Plaintiff filed a charge of discrimination against Community Imaging with the Maryland Commission on Human Relations alleging retaliation and sexual harassment. (Paper 47, Ex. AA). Specifically, she claimed that the written warning she received from Mr. Martinez on June 10 and her termination on June 13 were "in retaliation for complaining about sexual harassment from Mr. Joseph Martinez," and that she was "subjected to a sexual harassment working

environment and he requested sexual favors and touched me on my buttocks and made attempts to kiss me." (*Id.*).

After exhausting her administrative remedies, Plaintiff filed a complaint in this court on November 1, 2007, alleging retaliation and discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (Paper 1).[11] Defendant responded on June 12, 2008, by filing a motion to dismiss or, in the alternative, for summary judgment. (Paper 19). That motion was denied by a memorandum and order dated January 23, 2009. (Papers 27, 28). Following the close of discovery, Defendant filed the pending motion for summary judgment. (Paper 47).

## II. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party, then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250;

---

[11] Plaintiff had legal counsel at the time her complaint was filed, but has proceeded *pro se* ever since.

*see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. A complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, a mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment. *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th

Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. Analysis

In ruling on Defendant's motion to dismiss or for summary judgment the court construed the complaint as alleging sexual harassment, under both *quid pro quo* and hostile work environment theories, and retaliation. The parties have framed their arguments with respect to the instant motion in accordance with that construction, and the court will address each of these claims in turn.

### A. Sexual Harassment

Under Title VII, it is unlawful for an employer "to discriminate against an individual with respect to . . . terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment represents one form of this prohibited sex discrimination. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). There are two categories of sexual harassment that are generally recognized: (1) *quid pro quo* harassment, where sexual consideration is demanded in exchange for job

benefits; and (2) harassment that creates an offensive or hostile work environment. *See Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983); *Rachel-Smith v. FTData, Inc.*, 247 F.Supp.2d 734, 745 (D.Md. 2003).

### 1.   *Quid Pro Quo* **Sexual Harassment**

The *quid pro quo* variety of sexual harassment "refers to a situation where a supervisor explicitly makes submission to his or her unwelcome sexual advances a condition of employment," or where "the rejection of such advances is . . . the motivation underlying an employer's decision to take an adverse employment action against an employee." *Briggs v. Waters*, 484 F.Supp.2d 466, 477 (E.D.Va. 2007) (citing *Ellis v. Director, CIA*, No. 98-2481, 1999 WL 704692, at *3 (4th Cir. Sept. 10, 1999)). To establish a *prima facie* case, the plaintiff must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) her reaction to the harassment affected tangible aspects of compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action. *See Spencer v. General Electric*, 894 F.2d 651, 658 (4th

Cir. 1990), *overruled on other grounds by Farrar v. Hobby*, 506 U.S. 103 (1992).[12]

Once a *prima facie* showing is made, an inference of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action in question. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If the defendant meets that burden, "the inference of discrimination is dispelled and the plaintiff, who bears the ultimate burden of persuasion, must finally show that the proffered explanation is but a pretext for intentional discrimination." *Lewis v. Forest Pharms., Inc.*, 217 F.Supp.2d 638, 647 (D.Md. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Here, it is undisputed that Plaintiff has satisfied the first, third, and fifth elements of the *prima facie* analysis. As a female, Plaintiff is a member of a protected group; the harassment she alleges is based on sex; and, pursuant to 42

---

[12] In support of her claim that she "has established prima facie claim[s] of retaliation and a quid pro quo or hostile work environment," Plaintiff cites the court's opinion denying Defendant's motion to dismiss. (Paper 57, at 1). The finding in that decision, however, was that Plaintiff had alleged sufficient facts in her complaint that, if proven, would establish liability. On summary judgment, by contrast, Plaintiff "may not rely merely on allegations or denials in [her] own pleading; rather, [her] response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

U.S.C. § 2000e(b), any harassment perpetrated by a supervisor, such as Mr. Martinez, is automatically imputed to the employer. *See Rachel-Smith*, 247 F.Supp.2d at 745-46 (citing *Spencer*, 894 F.2d at 658, n.10).[13] Defendant challenges the second and fourth elements, however, arguing that Plaintiff cannot establish a *prima facie* case because "(1) she engaged in a consensual relationship with Mr. Martinez and (2) her reaction to the alleged harassment did not affect tangible aspects of her employment." (Paper 47, Attach. 1, at 44).

With regard to the first challenge, Defendant asserts that Plaintiff cannot establish that Mr. Martinez's advances were unwelcome because she was involved in a consensual relationship with him. The question of whether there was ever a consensual relationship, however, is clearly in dispute. At her deposition and in her affidavit, Plaintiff denies having ever been romantically involved with her former supervisor, and the affidavits of Ms. Mack and Ms. Agbebaku lend support to her claim. Defendant argues that Plaintiff's denial of a

---

[13] Although Defendant raises the affirmative defense established by the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), it has no application with regard to *quid pro quo* claims. *See Katz v. Dole*, 709 F.2d 251, 255 n.6 (4th Cir. 1983) ("Where the plaintiff's complaint is of *quid pro quo* harassment by supervisory personnel, the employer is strictly liable.") (citing *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir. 1982)); *see also Casiano v. AT&T Corp.*, 213 F.3d 278, 283-84 (5th Cir. 2000) (the *Faragher/Ellerth* defense is not applicable in *quid pro quo* claims).

relationship is based primarily on her "self-serving" deposition testimony, and that her "bald and uncorroborated denial of a consensual relationship does not raise a 'genuine' issue of material fact sufficient to defeat summary judgment." (Paper 47, Attach. 1, at 39). Defendant touts, by contrast, the "numerous pieces of credible evidence" it has put forth, including (1) the fact that Mr. Martinez "admitted [being involved in a relationship with Plaintiff] under oath subject to penalty of perjury in a deposition in this case"; (2) that he "has no interest in lying in a court proceeding"; and (3) that he provided detail regarding "the inside of Plaintiff's house, where they went on dates, and who they socialized with outside of work." (*Id.*). In other words, Defendant essentially asks the court to credit Mr. Martinez's deposition testimony over that of Plaintiff. That kind of credibility determination, however, is inappropriate on a motion for summary judgment. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644 (4th Cir. 2002) (court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility").

While Defendant also cites Ms. Thomas' affidavit as evidence that Plaintiff engaged in flirtatious behavior with her supervisor in the workplace, Plaintiff cites the same evidence

as supporting her claim that Mr. Martinez subjected her to unwanted touching. Indeed, the significance of Ms. Thomas' observations, if any, is subject to interpretation and properly left for the trier of fact to decide. The parties do not dispute that Ms. Thomas, among others, reported this behavior to the Human Resources department, thereby triggering an internal investigation, but that investigation concluded with a finding that no such relationship existed, based primarily on the denials of Plaintiff and Mr. Martinez. Viewing the evidence presented in the light most favorable to Plaintiff, as the court must, she has made a sufficient showing that she was never involved in a consensual sexual relationship with Mr. Martinez and that her supervisor's advances were unwelcome. Thus, she has established the second element of the *prima facie* analysis.[14]

Defendant further contends that Plaintiff has failed to establish the fourth element of the *prima facie* analysis, *i.e.*, that her reaction to the alleged harassment affected tangible

---

[14] In blithely assuming that the court would find, as a matter of law, that Plaintiff and Mr. Martinez were involved in a consensual relationship, Defendant cites several cases considering *quid pro quo* claims brought by employees who were the "jilted lover[s]" of their former supervisors alleging that adverse employment actions resulted from the dissolution of the relationships. *Campbell v. Masten*, 955 F.Supp. 526, 529 (D.Md. 1997); *see also Ellis*, 1999 WL 704692, at *3. Because there is a dispute as to whether a consensual relationship existed here, these cases are of limited value. They do illustrate, however, that a finding that a consensual relationship existed at some point is not tantamount to a finding that *quid pro quo* sexual harassment did not occur.

aspects of her employment. According to Defendant, "[t]here simply is no credible evidence of any causal connection between Plaintiff's rejection of Mr. Martinez's allegedly unwelcome overtures and her termination." (Paper 47, Attach. 1, at 40). To the contrary, there is evidence suggesting that Plaintiff received her first written "Performance Counseling" memorandum shortly after receiving flowers from Mr. Martinez in April 2005, and that during the meeting in which this discipline was discussed, she specifically asked Mr. Martinez, in the presence of Ms. Henry, why "every time I refute him and I turn down his offers or his candies that he gave me, this is when this performance counseling came about." (Paper 47, Ex. C, at 160). It is undisputed, moreover, that on June 8, Plaintiff reported to Ms. Henry that Mr. Martinez had been "harassing and stalking her," and that rather than report this to Human Resources, as she was required to do under the company's Harassment-Free Workplace policy, Ms. Henry told only Mr. Martinez, the alleged harasser. Two days later – and eight days after the alleged precipitating misconduct – Mr. Martinez and Ms. Henry issued Plaintiff a "Written Warning" that she refused to sign "because the information in it was misleading and some of it was fabricated." (Paper 24, Attach. 5, at ¶ 6). On the very next workday, according to Plaintiff, Mr. Martinez called her into her office, "tried to persuade [her] to have a romantic

relationship with him[,] and said he would let [her] start training for CT if [she] did and all the things that were happening to [her] would stop." (Paper 57, Attach 27, at ¶ 7). In response, Plaintiff threatened to tell other managers about the harassment and demonstrated that she had "proof" of his advances. (*Id.*; Paper 47, Ex. C, at 147). Later that same day, she was terminated.

"An inference of causation arises if the unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision." *Lewis*, 217 F.Supp.2d at 648-49 (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). Here, the termination of Plaintiff's employment was clearly a tangible employment action that was substantially influenced by Mr. Martinez, and the temporal proximity between that action and Plaintiff's rejection of his advances – a matter of several hours – is sufficient to establish the fourth element of the *prima facie* analysis.

Because Plaintiff has made a sufficient showing as to all required elements, the burden shifts to Defendant to set forth legitimate, non-discriminatory reasons for terminating her employment. Defendant's asserted justification for its action eliminates the presumption of discrimination raised by Plaintiff's *prima facie* case. Thus, the burden returns to

Plaintiff to point to evidence demonstrating that the proffered justifications for her termination are pretext for discrimination. She has met that burden here.

The thrust of Plaintiff's argument in opposition to Defendant's motion is that Community Imaging was "misled and deceived by Mr. Martinez," insofar as Ms. Trevathan and "others in upper management and human resources relied solely on inaccurate information" presented by him in deciding to terminate her employment. (Paper 57, at 2). There is sufficient evidence to permit a rational factfinder to conclude that was the case. There is no dispute that the decision to terminate Plaintiff's employment was ultimately based on the events that occurred in Mr. Martinez's office just before lunchtime on June 13, 2005. It is also undisputed that, by that date, Mr. Martinez was aware that Plaintiff had complained to Ms. Henry about his alleged harassment. The parties further agree that, during that meeting, Plaintiff informed her supervisor that she had "proof" of his advances that she threatened to share that proof with other managers. The only real dispute, then, is regarding what precipitated Plaintiff's threat, and the only evidence on that point is presented by Plaintiff's affidavit and deposition and the competing deposition testimony of Mr. Martinez. According to Plaintiff, Mr. Martinez promised that her recent rash of disciplinary

troubles would stop and that he would permit her to begin training in a new area if she would consent to a romantic relationship with him. Mr. Martinez testified, on the other hand, that Plaintiff's threat was essentially a blackmail tactic in order to receive the cross-training that she wanted. The question of which of this competing evidence is more credible is not for this court to decide on summary judgment; rather, the relevant question at this juncture is whether a rational factfinder could conclude, based on the present record, that Plaintiff was the victim of *quid pro quo* sexual harassment. That question is answered in the affirmative. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim of *quid pro quo* sexual harassment will be denied.

### 2. Hostile Work Environment Sexual Harassment

To establish a *prima facie* case of hostile work environment sexual harassment, Plaintiff must show that: (1) she was subjected to unwelcome conduct; (2) the unwelcome conduct was based on sex; (3) the conduct was sufficiently pervasive or severe to alter the conditions of employment and create a hostile work environment; and (4) some basis exists for imputing liability to the employer. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241-42 (4th Cir. 2000). It has already been determined that Plaintiff has presented evidence that she was subjected to unwelcome conduct based on her sex. Defendant

argues that Plaintiff cannot show that the behavior to which she was allegedly subjected was sufficiently severe or pervasive.

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993), the Supreme Court explained that in order to be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive – *i.e.*, one that a reasonable person would find hostile or abusive and one that the plaintiff found to be so. The Court further instructed that the determination of the sufficiency of an environment's hostility or abusiveness should be made by considering all circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23. Simple teasing, offhand comments, and isolated incidents (unless extremely serious), do not qualify as having an effect on the "terms and conditions of employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

Here, Plaintiff has offered deposition testimony and affidavit statements establishing that over a period of approximately five months, Mr. Martinez repeatedly touched her breasts, buttocks, arms, legs, hair, and attempted to kiss her in the workplace. (Paper 47, Ex. C, at 66, 68, 89-104; Paper 57, Attach. 27, at ¶ 2). He often did this in confined spaces,

such as in an x-ray room or behind the closed door of his office, when other employees had left work for the day. (Paper 47, Ex. C, at 88-91, 97, 99). Despite Plaintiff's resistance of his advances and repeated expression of disinterest in a romantic relationship, Mr. Martinez persisted in calling her cell phone, sending her text messages, asking her on dates, sending her flowers, and, on at least one occasion, parking outside her home. (Paper 24, Attach. 4, at ¶¶ 3-7; Attach. 5, at ¶¶ 4, 7; Paper 47, Ex. C, at 207-08). This conduct was "unwelcomed" by Plaintiff, caused her to feel "uncomfortable and embarrassed," and, ultimately, to experience acute stress and depression. (Paper 24, Attach. 4, at ¶ 8; Paper 47, Ex. C, at 128; Paper 57, Attach. 27, at ¶¶ 2, 7). The court finds that Plaintiff has presented sufficient evidence to establish that the discriminatory conduct she allegedly suffered was frequent, severe, and objectively offensive. She has, therefore, established the third element of the *prima facie* analysis for hostile work environment.

Defendant argues that even if Plaintiff can establish a *prima facie* case of hostile work environment sexual harassment, it cannot be held liable pursuant to the holdings of *Faragher*, 524 U.S. at 807-08, and *Ellerth*, 524 U.S. at 765, which establish that an employer is not vicariously liable for an actionable hostile work environment created by a supervisor with

immediate (or successively higher) authority over the employee when:

> (a) [] the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) [] the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765.  According to Defendant, it exercised reasonable care by maintaining a comprehensive anti-harassment policy prohibiting sexual harassment and identifying the procedure pursuant to which complaints could be addressed. Defendant further contends that Plaintiff unreasonably failed to take advantage of the avenues of redress it offered because she never complained about Mr. Martinez's conduct "until it became evident that her own behavior was jeopardizing her employment." (Paper 47, Attach. 1, at 47).

The *Faragher/Ellerth* defense is explicitly not available to an employer, however, when a "supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808 (citing *Ellerth*, 524 U.S. at 762-63).  Here, Plaintiff's termination was unquestionably a tangible employment action, and the harassing conduct alleged by Plaintiff culminated in her discharge.  While Mr. Martinez may not have unilaterally decided to terminate her employment, the decision was nevertheless based on his report of

what occurred in his office on June 13. Thus, the affirmative defense could have no application here.

In any event, Plaintiff has provided evidence that she reported Mr. Martinez's harassing conduct to Ms. Nichols, a human resources representative, during an interview in March 2005; to Ms. Henry, her supervisor, in the May 11 memorandum; and, ultimately, to Ms. Adams, the Director of Human Resources, on or about June 13. Defendant disputes that Plaintiff made the first two of these complaints, but acknowledges that she made a verbal complaint to Ms. Henry on June 8, which her supervisor failed to report to Human Resources, as she was required to do under Community Imaging's anti-harassment policy. Under these circumstances, it cannot be said that Defendant exercised reasonable care to prevent and promptly correct the alleged harassing behavior. Because Plaintiff has demonstrated a *prima facie* case of hostile work environment sexual harassment and the affirmative defense asserted by Defendant cannot apply, Defendant's motion for summary judgment will be denied as to this claim.

### B. Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must show the following elements: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between the

protected activity and the adverse employment action. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998). The plaintiff's burden in this regard is "not onerous," and requires only that she prove each element by a preponderance of the evidence. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the plaintiff makes such a showing, the burden shifts to the employer to offer a non-discriminatory basis for the adverse employment action. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001). The employee then has the opportunity to prove that the asserted reason is pretextual. *Id.; see also Smith*, 202 F.3d at 248 ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII.").

Title VII makes it unlawful for "an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Protected activity of an employee, therefore, can take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an

investigation, proceeding, or hearing under Title VII (pursuant to the participation clause).

Here, Plaintiff has presented evidence showing that she made a number of informal complaints regarding Mr. Martinez's harassment. It is undisputed, however, that at the time she made these protests, Plaintiff had not yet lodged a formal complaint with the EEO. Indeed, that was not done until after she was terminated. (Paper 47, Ex. C, at 53). Thus, her activity can only be considered protected under the opposition clause, not under the participation clause of § 2000e-3(a). "The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981). Because Plaintiff's verbal and/or written complaints to Ms. Nichols, Ms. Henry, and Ms. Adams constitute protected activity, the first element of the *prima facie* analysis is satisfied. The second element is also established, as Plaintiff was ultimately fired from her position.

Defendant contends that Plaintiff cannot establish the third element, *i.e.*, that there is a causal connection between the protected activity and the adverse employment action. "Normally, very little evidence of a causal connection is required to establish a *prima facie* case." *Tinsley*, 155 F.3d at

34

443. The instant record reflects that Plaintiff's employment was terminated within hours of calling Ms. Adams' office to complain about Mr. Martinez's sexual harassment. Mere temporal proximity between engaging in a protected activity and an adverse employment action may be sufficient to establish the causation element of a retaliation claim. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (an employee's firing within three and a half months of her engaging in protected activity was sufficient to establish the causation element).

Plaintiff testified that at the meeting with Mr. Martinez on the morning of June 13, her supervisor made advances toward her and made certain promises regarding the conditions of her employment if she would agree to engage in a romantic relationship with him. She showed him what she believed to be "proof" of his inappropriate conduct and threatened to "show anyone in the company that would help [her] if he did not stop trying to touch [her] inappropriately and harass[] [her]." (Paper 57, Attach. 27, at ¶ 7). Indeed, Mr. Martinez acknowledged that he knew Plaintiff "had leverage over [him] at that point." (Paper 47, Ex. B, at 84). After leaving his office, Plaintiff called Ms. Adams for the purpose of making a

complaint.[15]   Hours later, she was terminated.   Under those facts, there is sufficient evidence of a causal connection between the protected activity and the adverse employment action.   Therefore, Plaintiff has established a *prima facie* case of retaliation.

Defendant has set forth legitimate, non-discriminatory reasons for Plaintiff's termination, *i.e.*, that she was terminated for insubordination and failure to comply with workplace policies.   Thus, the burden returns to Plaintiff to demonstrate that these reasons are pretext for discrimination. As noted previously, however, there is a genuine dispute of material fact as to the reason for Plaintiff's termination. Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim will be denied.

---

[15]   Defendant argues that Plaintiff "did not contact Community Imaging's Human Resources hotline number until June 13, 2005 – when it was clear to her that Community Imaging intended to terminate her employment – even though she had access to the hotline number daily in the breakroom."   (Paper 58, at 4).   It has, however, pointed to no evidence establishing that, at the time the call was made, Plaintiff was aware that she would be terminated; in fact, Defendant insists that Mr. Martinez did not have the authority to terminate her employment. Moreover, Plaintiff's prior reports to Ms. Nichols and/or Ms. Henry were in keeping with the company's anti-harassment policy, which reflects that the hotline number is essentially a last resort when attempts to notify supervisors and Human Resources representatives have been unsuccessful.   (Paper 47, Ex. E). There is a reasonable view of the evidence that Plaintiff had good reason to exercise that last resort on the day in question, and that her motivation was not "solely to avoid discipline," as Defendant suggests.   (Paper 58, at 3).

## IV.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be denied.  A separate order will follow.

```
_____/s/_____
```
DEBORAH K. CHASANOW
United States District Judge